UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )        CRIMINAL MATTER
            v.                      )        NO. 09-10281-WGY
                                    )
DEWAYNE HAMPTON,                    )
                                    )
                    Defendant.      )
_____ )


YOUNG, D.J.                                      June 18, 2015

<u>MEMORANDUM AND ORDER</u>

## I.    INTRODUCTION

Habeas Petitioner Dewayne Hampton ("Hampton") seeks post-conviction relief based on the now infamous scandal involving state lab chemist Annie Dookhan ("Dookhan").  Mot. Vacate, Set Aside, or Correct Sentence Person Federal Custody, Ex. 1, Mot. Vac. Plea Alternative, Vacate Sentence, Pursuant 28 U.S.C. § 2255 ("Def. Br."), ECF No. 91-1.  This case presents an issue of first impression in the growing line of cases resulting from the Dookhan scandal.  Hampton does not seek to vacate his guilty plea but instead argues that his Due Process rights were violated because the mandatory minimum sentence imposed on him was based on a quantity of drugs tested and weighed by Dookhan. The Court holds that on this unusual (and thus far, unique) set

1

of facts, Hampton is entitled to relief in the form of resentencing.

### A.    Factual Background

#### 1.    Hampton's Arrest and Testing of Substances

Hampton – along with co-defendants Willie Brown ("Brown") and Ashley Clark ("Clark") – was a member of a drug distribution conspiracy.  Opp'n. Dewayne Hampton's Mot. Vacate ("Govt. Br.") 3, ECF No. 93.  Between October 2008 and August 2009, a cooperating witness, at the direction of law enforcement agents, allegedly purchased 350 grams of crack cocaine from the three defendants during twenty-one controlled sales.  Id.  The government avers that Hampton participated directly in twenty of the twenty-one transactions, each of which involved a sale of either a half ounce or a full ounce of crack cocaine.  Id.  An additional fifty grams of crack cocaine were seized from Hampton's residence during his arrest.  Id. at 1.

Of the twenty controlled purchases attributable to Hampton, on at least one occasion law enforcement agents field tested the substances collected, which yielded a positive result for cocaine.  Id. at 4.  The substances recovered from eighteen of the purchases were tested at the Hinton State Laboratory in Jamaica Plain where Dookhan worked (the "state lab").  See id. Of those eighteen samples, Dookhan was the primary or secondary

chemist for fourteen samples.[1]  Id. at 4-5.  Two samples were

tested by a Drug Enforcement Agency lab.  Id. at 4.  All tests

returned positive results for cocaine.  Id.

## 2. Annie Dookhan

Dookhan worked as a chemist at the state lab from 2003

until 2012.  See Def. Br. 7, 11.  In June 2011, Dookhan's

supervisors discovered she had taken evidence from a safe

without authorization, removed ninety drug samples from the

office, and forged a co-worker's initials on the evidence log.

Supplemental Mem., Ex. A, Investigation Drug Lab. William A.

Hinton State Lab. Inst. 2002-2012 ("OIG Report") 63, 65, ECF No.

113-1.  The Department of Public Health ("DPH") Director of

Laboratory Services reported the incident by letter to the

Norfolk District Attorney in February 2012.  Id. at 72.  Dookhan

went on administrative leave in February 2012 and resigned on

---

[1] The state lab used two levels of testing for substances.
The initial testing was done by the "primary chemist," who is
responsible for performing simple bench top tests such as color
tests, microcrystalline analyses, and ultraviolet visualization.
The primary chemist then prepared a sample of the substance for
the "confirmatory chemist."  The confirmatory chemist ran the
substance through a gas chromatography-mass spectrometry
("GC/MS") machine, which produced instrument-generated
documentation of test results.  The two chemists would then
confer to confirm consistent results.  Following these two
levels of testing, the primary chemist prepared a drug
certificate for notarized signature by both chemists.
Commonwealth v. Scott, 467 Mass. 336, 340-41 (2014).  Dookhan
performed the role of both primary and confirmatory chemist
during her time at the state lab.  See Govt. Br. 5.

March 9, 2012.  Id. at 73.  After further investigation, the lab

closed.  Id. at 20.

Dookhan was charged in the Massachusetts Superior Court

with twenty-nine crimes, including perjury, obstruction of

justice, tampering with evidence, and falsely claiming to hold a

degree.  Def. Br. 5.  In November 2013, Dookhan pled guilty to

twenty-seven counts and subsequently was sentenced to three to

five years in prison, followed by two years of probation.  OIG

Report 11.  Discovery in the case against Dookhan revealed that

she breached lab protocol by, among other things:

- Dry-labbing (certifying, without testing, that a substance was the suspected drug);
- Placing samples from different cases together on her bench;
- "Batching" samples together and testing some but not others;
- Intentionally contaminating a sample by using a known drug from a completed test;
- Falsifying other chemists' initials on quality control/confirmatory documents;
- Falsely certifying having run quality control/confirmatory test samples;
- Failing to properly calibrate her scales to ensure the accuracy of the drug weights measured by the chemist; and
- Communicating directly with prosecutors about specific cases.

See OIG Report.

There is no evidence in **this** case, however, that Dookhan

tampered in any way with the samples submitted to the laboratory

from the sales by Hampton.

## B.    Procedural Background

All the defendants in this case were indicted on one count of knowingly and intentionally conspiring to distribute fifty or more grams of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A). Criminal Compl., ECF No. 1. All three defendants were arrested on September 3, 2009. Arrest Warrants, ECF Nos. 10, 11, 12. Clark and Brown pled guilty on February 10, 2011. Elec. Clerk's Notes, February 10, 2011. Clark was sentenced to time served (four days) plus twenty-four months of supervised release. Elec. Clerk's Notes, May 19, 2011. Brown was sentenced to a term of imprisonment of sixty months, followed by four years of supervised release. Elec. Clerk's Notes, March 28, 2011.

After initially pleading not guilty, Hampton subsequently changed his plea on April 27, 2011. Elec. Clerk's Notes, April 27, 2011. Prior to the plea hearing, the government provided Hampton with certificates of analysis reflecting that the substances recovered from the controlled purchases contained cocaine base.[2] Def. Br. 2. At the change-of-plea hearing, the government argued in front of Judge Nancy Gertner that she ought

---

[2] No test was conducted on the fifty grams of substance seized from Hampton's residence during his arrest. Govt. Br. 7.

impose a statutory minimum sentence of ten years because more than 280 grams of crack cocaine were attributable to Hampton.[3] See Change Plea Hr'g Tr. ("Plea Tr.") 4, ECF No. 78. Hampton's counsel made clear at the hearing that although Hampton was pleading to the conspiracy, he was not pleading to "any particular transaction or any particular amount [of cocaine base] at this point." Id. at 8-9. Judge Gertner informed Hampton that the "precise amounts [of crack cocaine] that you're responsible for . . . will be something we will figure out at sentencing." Id. at 9.

Judge Gertner thoroughly informed Hampton of the rights he was giving up by pleading guilty. Id. at 5. In exchange for Hampton's guilty plea, the government agreed not to seek enhancements based on prior convictions and agreed to recommend a sentence no higher than the mandatory minimum. See id. at 6. The government also agreed to recommend that a sentence imposed on Hampton for revocation of a previously imposed supervised release run concurrently with the sentence imposed by Judge Gertner. Id. at 6-7. Judge Gertner asked Hampton if he was "pleading guilty because you are guilty and for no other reason," to which Hampton responded "Yes, ma'am." Id. at 9. At

_____

[3] The government attributed nearly 400 grams to Hampton. Fifty were taken from his home upon his arrest and were not tested. Almost 270 grams were tested by Dookhan. 52 grams were tested and stored by other chemists at the state lab. 28 grams were tested by the DEA laboratory. Def. Br. 2-3, 24.

no point did Hampton contend that any of the substances recovered in connection with his case were not cocaine base, nor does he now. <u>See</u> Supplemental Mem. 2.

At the sentencing, Judge Gertner accepted the computations of crack cocaine from the Presentence Report, which calculated the substance attributable to Hampton to exceed 280 grams. <u>See</u> Sentencing Tr. 3, 18, 21, ECF No. 76. Taking care to note her personal opinion that the congressionally imposed sentencing disparities between cocaine powder and cocaine base were "inhumane," <u>id.</u> at 17, Judge Gertner sentenced Hampton to the mandatory minimum of ten years, followed by sixty months of supervised release,[4] <u>id.</u> at 19; J. Criminal Case 2-3, ECF No. 73. Judge Gertner specifically noted that without a statutory minimum, she would have imposed a sentence on Hampton corresponding to a sentence comparable for cocaine powder, which would have been 70-87 months. Sentencing Tr. 18-19.

On August 10, 2011, Hampton appealed his sentence to the First Circuit Court of Appeals. Notice Appeal, ECF No. 74. Hampton subsequently moved to dismiss his appeal, and the First

_____

[4] Judge Gertner began with a sentencing level of thirty-two for the amount of cocaine base. She added two levels for being an organizer/leader and subtracted three levels for acceptance of responsibility, resulting in a sentencing level of thirty-one. Hampton had a criminal history of V, which resulted in a sentencing guidelines range of 168-210 months. Judge Gertner nevertheless sentenced Hampton to the statutory minimum of 120 months. <u>Id.</u> at 4, 9; Sentencing "Statement of Reasons" 2, ECF No. 73-1.

Circuit granted the motion.  Judgement USCA, ECF No. 80.  The
case was transferred to this Session on November 13, 2012.
Notice Reassignment, ECF No. 83.

Hampton filed the instant petition on August 21, 2013.
Def. Br.  The government opposed on September 5, 2013.  Govt.
Br.  Hampton replied on October 25, 2013, Reply Gov't's Opp'n
Mot. Vacate, ECF No. 95, and supplemented his petition with new
legal and factual developments on May 9, 2015, Supplemental Mem.[5]
This Court heard oral argument on the petition on May 11, 2015.
Elec. Clerk's Notes, ECF No. 116.

## II.  LEGAL STANDARD

Title 28 U.S.C. § 2255 allows a federal prisoner to
collaterally attack his or her sentence if it "(1) was imposed
in violation of the Constitution, or (2) was imposed by a court
that lacked jurisdiction, or (3) exceeded the statutory maximum,
or (4) was otherwise subject to collateral attack."  David v.
United States, 134 F.3d 470, 474 (1st Cir. 1998).  The fourth,

_____

[5] In his original petition, Hampton asked the Court to
vacate his guilty plea, or in the alternative, vacate his
sentence.  Def. Br. 18-19.  Hampton argued that Judge Gertner
violated his Sixth Amendment rights by herself finding
sentencing enhancements using the "preponderance of the
evidence" standard.  See id. at 18-19.  Hampton argued that,
pursuant to the Supreme Court's decision in Alleyne v. United
States, 133 S. Ct. 2151 (2013), a jury was required to find such
facts beyond a reasonable doubt.  In his supplemental
memorandum, however, Hampton acknowledged that Alleyne does not
apply retroactively.  Supplemental Mem. 1.  The sole argument
left standing is Hampton's request to vacate his sentence.  Id.
at 5.

catch-all category requires a showing of error that reveals "fundamental defects which, if uncorrected, will result in a complete miscarriage of justice." Id. (internal quotation marks and alterations omitted). A viable Section 2255 attack must reveal "exceptional circumstances" demanding redress, and the burden is on the petitioner to make this showing. Id.

## III. ANALYSIS

Hampton argues that the Court ought vacate his sentence because the prosecutor's failure to disclose Dookhan's misconduct tainted his sentencing record in violation of Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006), and violated his right to Due Process under Brady v. Maryland, 373 U.S. 83 (1963). Def. Br. 20-32. Of the federal courts to have addressed post-conviction petitions under Brady and Ferrara in the wake of the Dookhan scandal, not one has vacated a guilty plea. United States v. Wilkins, 943 F. Supp. 2d 248 (D. Mass. 2013) (Stearns, J.) ("Wilkins I"), aff'd, 754 F.3d 24 (1st Cir. 2014) ("Wilkins II") and 755 F.3d 6 (1st Cir. 2014); United States v. Snow, No. 11-cr-10299-DJC, 2015 WL 2226233 (D. Mass. May 11, 2015) (Casper, J.); United States v. Tooley, No. 10-cr-0157-DJC, 2015 WL 566953 (D. Mass. Feb. 11, 2015) (Casper, J.); United States v. Gray, No. 10-cr-10075-PBS, 2015 WL 178450 (D. Mass. Jan. 14, 2015) (Saris, C.J.); United States v. Smith, No. 07-cr-10143-NMG, 2014 WL 7179472 (D. Mass. Dec. 15, 2014)

(Gorton, J.); United States v. Jackson, 54 F. Supp. 3d 102 (D. Mass. 2014) (Saris, C.J.); United States v. Chin, 54 F. Supp. 3d 87 (D. Mass. 2014) (Saris, C.J.); United States v. Smith, No. 09-cr-10006-RGS, 2013 WL 6798931 (D. Mass. Dec. 20, 2013) (Stearns, J.).

What none of these cases address, however, is a request for post-conviction relief when a statutory mandatory minimum sentence was – at least as the law stands after Alleyne – unconstitutionally imposed based on a drug quantity weighed by Dookhan. The Court does so now.

### 1. Egregious Government Misconduct (Ferrara v. United States)

Hampton argues that Dookhan's egregious misconduct renders his sentence "inherently unreliable." Def. Br. 25. To support his argument, he attempts to apply Ferrara v. United States, in which the First Circuit established a two-pronged test for when a court should set aside a guilty plea as involuntary:

> First, [the defendant] must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea.

> Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.

<u>Ferrara</u>, 456 F.3d at 290 (internal citations omitted) (citing <u>Brady</u> v. <u>United States</u>, 397 U.S. 742, 755 (1970)).[6]

<u>Ferrara</u> is the focus of the vast majority of habeas cases that have flowed from the Dookhan scandal. As the government correctly points out, however, <u>Ferrara</u> is inapplicable to Hampton's case because Hampton does not assert that had he known of the Dookhan scandal, he would not have pled guilty to the offense. Govt. Br. 21. Moreover, because Hampton did not concede at the plea hearing that he distributed more than 280 grams, he cannot claim he involuntarily pled to the quantity of drugs. For this reason, <u>Ferrara</u> is inapplicable to this case.

### 2. Prosecutor's Duty to Disclose Exculpatory Evidence (<u>Brady</u> v. <u>Maryland</u>)

Hampton also seeks to vacate his sentence because the government failed to disclose Dookhan's misconduct in accordance with its obligations under the Due Process Clause. In <u>Brady</u> v. <u>Maryland</u>, the Supreme Court held that suppression by the government of evidence favorable to the defendant violates due

---

[6] <u>Ferrara</u> was an Italian mobster murder case in which the prosecutor deliberately manipulated a key witness, convinced the witness to perjure himself in court, and made affirmative misrepresentations to the court regarding the planned testimony of the witness. 456 F.3d at 291-93. A portion of the factual basis for the plea relied on the false statements of the witness, which the prosecutor knew to be false. <u>Id.</u> at 284-85. The recanted testimony established the factual innocence of the defendant who, despite his guilty plea to a multi-count indictment, had consistently maintained his innocence of the murder charge. <u>Id.</u> at 284.

process when the evidence is material either to guilt or to punishment. 373 U.S. 83, 87 (1963). This obligation applies irrespective of the good faith or bad faith of the prosecution, id., and extends to evidence tending to exculpate due only to its tendency to impeach the credibility of government witnesses, United States v. Bagley, 473 U.S. 667 (1985).

In another Dookhan case in which the defendants sought to vacate their guilty pleas, Judge Stearns held that Brady was not material to the case because Brady is a trial rule and does not come into play when a defendant makes a knowing and intelligent guilty plea. Wilkins I, 943 F. Supp. 2d at 255. The instant case differs from Wilkins I, however, in that Hampton's habeas petition is not about his own behavior in making a plea but is about the actual evidentiary basis provided by the government for the imposition of a mandatory minimum. Supplemental Mem. 2. Brady therefore remains open to Hampton.

To establish a Brady violation, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "Favorable evidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different." <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 433

(1995) (internal quotation marks omitted).  To constitute a

<u>Brady</u> violation, the evidence can be material either to guilt or

punishment.  <u>Brady</u>, 373 U.S. at 87.

### a. **Prejudice**[7]

As is true in all of the Dookhan cases that have been heard

in federal courts in this district, there is no indication in

the record that Dookhan tampered with evidence <u>in this case</u>.

Rather, the argument Hampton puts forth is that Dookhan's

general malfeasance, including her failure properly to calibrate

scales and the fact that she co-mingled evidence collected from

multiple cases, renders unreliable her signature on the drug

certificates.  <u>See</u> Supplemental Mem. 2.[8]  Hampton essentially

---

[7] The favorability of the evidence requires no explanation.
As other federal courts have noted, it is easy to see how one
could "score points" at trial by using the Dookhan scandal to
cross examine Dookhan or a chemist who retested the substances.
<u>Chin</u>, 54 F. Supp. 3d at 92.

[8] In deciding on motions to vacate guilty pleas under
<u>Ferrara</u>, other sessions of this court have found such arguments
about Dookhan's general malfeasance unpersuasive.  They have
instead held that in order to successfully seek habeas relief,
the defendant must demonstrate that Dookhan mishandled evidence
in that particular case.  <u>Snow</u>, 2015 WL 2226233, at *4
(observing that there was no indication that Dookhan mishandled
the drugs in that particular case); <u>Brown</u>, 2015 WL 1268159, at
*4 (noting that "the mere fact that Dookhan was involved in
Brown's case does not justify a new trial" and stating that
"[a]s other cases involving Dookhan demonstrate, some additional
showing is necessary"); <u>Chin</u>, 54 F. Supp. 3d at 93 (noting that
Dookhan had no involvement in the defendant's case); <u>Wilkins I</u>,
943 F. Supp. 2d at 257 (noting that Dookhan's general malfeasance

argues that without the drug certificates, he "would not have been subject to the 10-year mandatory minimum." Def. Br. 22.

The government argues that the record presents more than enough circumstantial evidence for the ten-year sentence to stick. For support, the government points out that there is no indication anywhere in the record that the substances were counterfeit. Govt. Br. 17. The government also reminds the Court that Hampton admitted under oath in the plea hearing that he conspired to distribute crack cocaine. Id. In addition, some of the samples Hampton sold were field tested, two samples were tested by another lab, and four samples were tested at the state lab by other chemists - and none of these tests concluded

---

"did not affect the integrity of the drug samples involved"); Smith, 2013 WL 6798931, at *3 (noting the absence of coercive misconduct that compromises a defendant's claim of factual innocence); Wilkins II, 754 F.3d at 29 (observing that the drugs had been retested and that there was no indication Dookhan had tampered with the unopened bags); Smith, 2014 WL 7179472, at *5 (stating that there was "no direct evidence showing that Dookhan's misconduct marred the contraband seized from the residence"); Jackson, 54 F. Supp. 3d at 108 (acknowledging that evidence analyzed by Dookhan in her role as primary chemist is suspect, but declining to vacate guilty plea because there was no evidence tying Dookhan's conduct as a confirmatory chemist to the evidence in Jackson's case).

The Massachusetts Supreme Judicial Court, on the other hand, has held that "in cases in which a defendant seeks to vacate a guilty plea under Mass. R. Crim. P. 30(b) as a result of the revelation of Dookhan's misconduct, and where the defendant proffers a drug certificate from the defendant's case signed by Dookhan on the line labelled 'Assistant Analyst,' the defendant is entitled to a conclusive presumption that egregious government misconduct occurred in the defendant's case." Scott, 467 Mass. at 352.

that the substances were anything other than cocaine base.  Id.
at 18.  The consistency of these samples, the government says,
is a strong indicator that all of the samples (weighing a
collective 350 grams) taken from Hampton during the controlled
sales were crack cocaine.  Id. at 1, 18.

In another case in which a defendant who did not plead
guilty had the misfortune of drawing Dookhan as a chemist, Judge
O'Toole held that there had been no Brady violation because the
defendant had failed to demonstrate prejudice.  Brown, 2015 WL
1268159, at *4.  Judge O'Toole based this holding in part on the
fact that subsequent retesting of the drugs confirmed the
accuracy of Dookhan's testing.  Id.  In this case, by contrast,
there has been no reweighing of the substances, thus depriving
this Court of concrete facts upon which it can conclude that
there was no prejudice to Hampton.

Finally, it is significant to note that Judge Gertner
imposed this sentence reluctantly based on the statutory
mandatory minimum corresponding to the 280 grams.  See
Sentencing Tr. 21 (observing the unfairness of the disparity
between mandatory sentences for selling crack cocaine and
cocaine powder).  There is thus a reasonable probability that,
had Judge Gertner known of the Dookhan scandal and that Dookhan
had worked on roughly two-thirds of the 400 grams attributed to
Hampton, see Def. Br. 2-3, 24, the outcome of Hampton's

sentencing would have been different.  This Court would therefore be warranted in holding that Hampton has met the prejudice element of the <u>Brady</u> analysis.

### b.  Did the State Suppress Evidence?

There is no allegation in the papers that the prosecutors knew of Dookhan's misconduct at the time Hampton pled guilty. Indeed, the first communication about the misconduct to any prosecutors took place almost a year after Hampton pled guilty. <u>See</u> Def. Br., Ex. I, Letter from Linda Han, ECF No. 91-10.  A pivotal issue then, is whether Dookhan's conduct can be imputed to the U.S. Attorney's Office.

To comply with <u>Brady</u>, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf."  <u>Kyles</u>, 514 U.S. at 437.  This is so because the government's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." <u>Strickler</u>, 527 U.S. at 281 (internal quotations omitted).

In a non-<u>Brady</u> case, Judge Woodlock was called upon to decide whether a state police officer who was assisting the Drug Enforcement Agency was part of the federal "prosecution team." <u>United States</u> v. <u>Mannarino</u>, 850 F. Supp. 57, 65 (D. Mass. 1994) (Woodlock, J.).  Citing to the Fifth Circuit, Judge Woodlock noted that "[i]mposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset

of an investigation would artificially contort the determination
of what is mandated by due process. Rather than endorse a per
se rule, we prefer a case-by-case analysis of the extent of
interaction and cooperation between the two governments." Id.
(quoting United States v. Antone, 603 F.2d 566, 570 (5th Cir.
1979)) (internal quotation marks omitted). Judge Woodlock noted
that "the liability of a principal is affected by the knowledge
of an agent concerning a matter as to which he acts within his
power to bind the principal or upon which it is his duty to give
the principal information." Id. at 66 (quoting Restatement
(Second) of Agency (1958), § 272) (internal quotation marks
omitted). Judge Woodlock found that the state police officer
was "clothed by the DEA with the indicia of agency," and he
therefore imputed the state police officer's action to the
prosecution team. Id.

In the context of the Dookhan cases, the First Circuit has
expressly reserved the question of whether Dookhan, a laboratory
worker employed by the Commonwealth, should be considered part
of the federal "prosecution team." Brown, 2015 WL 1268159, at
*4 (D. Mass. Mar. 19, 2015) (citing Wilkins II, 754 F.3d at 28).
The only Massachusetts District Court judge to address the issue
in the context of Dookhan is Judge Stearns, who stated in dicta
that "[w]hile no case in the First Circuit specifically
addresses the federal government's exculpatory duty with respect

to impeaching evidence involving a state-employed witness like Dookhan, the safer course is to assume that the duty attaches." Wilkins I, 943 F. Supp. 2d at 255 n.9.[9]

It was against this background that the Court convened the habeas petition hearing on May 11, 2015.  Early on during that hearing, I floated the idea of an evidentiary hearing to sort out Dookhan's relationship to the prosecution team in this case and how she had handled the alleged crack cocaine seizures in this case – and was met with stonewalling:

> AUSA:      [T]his matter comes to you as a 2255 and it
>            seems to me what you've got to do is to
>            determine, based on the record, whether
>            there's prejudice or not, and you may not
>            like a PSR generally, but that's what the
>            record is.
>
> Court:     Well, of course, it's part of the record.
>            Errors are made.  We now know things we did
>            not know.  Surely I can hold an evidentiary
>            hearing.  And I'm suggesting that the best
>            justice may be to hold done.  And at such
>            hearing either you stipulate or you prove
>            your direct evidence case, which is six such
>            sales, and your circumstantial evidence case
>            in which you're asking me to infer that
>            given the other sales the weight would have
>            been, and if I add them all up, they'd be
>            above the 280 grams.  I understand how to
>            hold such a hearing, it doesn't need to be
>            long, but it needs to be evidence, not – and
>            I mean no disrespect to the probation
>            officers, but the probation officers put in
>            a presentence report, which is what the

---

[9] Borrowing from the state's Brady jurisprudence, Massachusetts courts regard Dookhan as a member of the Commonwealth prosecution team for purposes of deciding whether to vacate guilty pleas.  Scott, 467 Mass. at 348-50.

> government tells them to get ready for
> sentencing.  I need an evidentiary hearing
> on which I can make findings.  I can't make
> findings on a PSR.  And so that's what I'm
> thinking.

> AUSA:    [I]f that's what the Court feels it needs to
> hold for the government, I am suggesting to
> you that the government doesn't want to
> expend those resources to defend that.  I
> think the record is sufficient for the Court
> to make a finding that there was no
> prejudice here.  I don't want to spend
> another, um -- . . . .

Unofficial Transcript 12-14.

In thirty years of federal judicial service, I have
frequently seen the government trim its sails as it plea
bargains to avoid the expense of actually proving its
contentions, but never before have I seen it decline to defend a
conviction with actual evidence.  This obdurate refusal even to
defend a minimum mandatory sentencing procedure that is today
unconstitutional against a background of undoubted criminal
misconduct in the handling of evidence – misconduct that raises
troubling questions about the accuracy of the sentence before
the Court - raises two interrelated questions.

First, is it within the discretion of the Court,
notwithstanding the First Circuit's caution not to hold
unnecessary evidentiary hearings in habeas proceedings, see Pike
v. Guarino, 492 F.3d 61, 70-71 (1st Cir. 2007), to hold one
here?  The answer is yes.  Mannarino, 850 F. Supp. at 60

(holding, after an evidentiary hearing, that state police officer was a member of the federal prosecution team); see also Commonwealth v. Sleeper, 435 Mass. 581, 605 (2002) (discussing a case in which the motion judge decided after an evidentiary hearing that government witness was not a member of the prosecution team, and therefore ruling that there was no Brady violation).

Second, is it reasonable (and just) in light of the government's refusal to confront the issue by way of evidence or even briefing to infer that, in the unique circumstances of this unusual case, Dookhan was a member of the prosecution team? Again, the answer is yes.

### III. CONCLUSION

For the reasons articulated above, therefore, the Court ALLOWS Hampton's motion to vacate his sentence (but not his conviction) and DENIES the government's request for summary dismissal. The following parameters will govern Hampton's resentencing:

A. No minimum mandatory sentence shall be imposed since to do so would be unconstitutional. Alleyne, 133 S. Ct. at 2158.

B. In accordance with United States Sentencing Commission, Guidelines Manual, §1B1.11 (Nov. 2014), the guidelines presently in effect shall govern the resentencing.

C.  Hampton's new sentence shall not exceed his present sentence since to do so would be vindictive.  <u>See</u> <u>Bridgeman</u> v. <u>Dist. Attorney for Suffolk Dist.</u>, 471 Mass. 465, 477 (2015).

D.  All the provisions of Hampton's plea bargain remain in full force and effect.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE